IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

MICHAEL LAWRENCE,  )
                   )
                   )
         Plaintiff, )
                   )
    vs.            )     No. 3:23-cv-00218-HRH
                   )
GENERAL ELECTRIC INTERNATIONAL, )
INC.,              )
                   )
                   )
         Defendant. )
_____)

O R D E R

Motion for Summary Judgment[1]

Defendant General Electric International, Inc. ("GE") moves for summary judgment in its favor as to the sole claim in this case— a Fair Labor Standards Act ("FLSA") claim.[2] The motion is opposed by Plaintiff Michael Lawrence ("Lawrence").[3] GE replied.[4] GE requested oral argument with the filing of its motion,[5] but argument

---

[1]Docket No. 23.

[2]Docket No. 1 at 3-4.

[3]Docket No. 32.

[4]Docket No. 33.

[5]Docket No. 23. *See* L.Civ.R. 7.1(f) (providing that oral argument may be requested by indicating as much immediately below the title of the motion).

ORDER – Motion for Summary Judgment      - 1 -

would not be of additional assistance to the court.

Background

This case involves a dispute about whether Lawrence, who worked for GE as a wind turbine technician in Anchorage, Alaska, is entitled to overtime pay for occasions when, due to inclement weather, he had to stay overnight at a remote job site. The relevant facts related to Lawrence's typical work day and how he used his time while stranded at the job site are undisputed and are as follows:

As a wind technician for GE, Lawrence was responsible for monitoring, repairing, and maintaining GE wind turbines.[6] To start a typical workday, a wind turbine technician like Lawrence arrives at GE's Anchorage office for a 7:00 a.m. start time.[7] The day begins with logging into GE's computer system to check operations data for several wind turbines GE operates on Fire Island.[8] Fire Island is a small island located a few miles from downtown Anchorage and is accessible only by plane.[9] On days where the data shows a turbine needs repair or maintenance, three technicians are flown via chartered airplane to Fire Island to conduct the needed operations.[10] Once dropped at the location, the plane departs. The crew completes all needed tasks throughout the day and then a plane returns to fly them back to Anchorage by 3:00 p.m., which is the end of the crew's eight–hour

---

[6]Docket No. 25-1 at 2-3 (Lawrence Dep. at 21, 56-57).

[7]Docket No. 25-1 at 4 (Lawrence Dep. at 117).

[8]Docket No. 25-1 at 4 (Lawrence Dep. at 116-17).

[9]*See* Fed. R. Evid. 201(b)(1) (allowing for facts "generally known within the trial court's territorial jurisdiction" to be judicially noticed); *see also* Docket No. 25-1 at 5 (Lawrence Dep. at 120-21) (discussing the need to charter an airplane to reach the island).

[10]Docket No. 25-1 at 4-5, 8 (Lawrence Dep. at 116-21, 139-40).

ORDER – Motion for Summary Judgment     - 2 -

shift.[11]

On occasion, weather prevents the chartered airplane from returning to Fire Island[12] or prevents the crew from completing the needed repairs in the turbine's hub or within the turbine's tower.[13] In those instances, the crew must stay overnight in a trailer-style bunkhouse on the island.[14] In the rudimentary bunkhouse, the crew members each have their own private room.[15] While on the island overnight, at the end of their regular shift, crew members have free time.

When Lawrence was stuck overnight on the island, he engaged in personal activities. He read books, watched video and social media content on his phone, walked the beach, took pictures, and drank beer or whiskey.[16] He was also allowed to bring his dog to the island and often did so.[17] Sometimes crew members talked about work, but the chats were not mandatory and Lawrence often avoided those discussions.[18] Lawrence was never awakened from sleep to perform any work-related tasks.[19]

In January 2023, in response to complaints about the overnight situation, GE began

---

[11]Docket No. 25-1 at 6 (Lawrence Dep. at 126-29).

[12]Docket No. 25-1 at 7 (Lawrence Dep. at 135-36).

[13]Docket No. 25-1 at 7 (Lawrence Dep. at 137).

[14]Docket No. 25-1 at 7, 10 (Lawrence Dep. at 135-37, 147-48).

[15]Docket No. 25-1 at 11 (Lawrence Dep. at 150).

[16]Docket No. 25-1 at 14-18 (Lawrence Dep. at 169, 172, 175, 177, 180, 182).

[17]Docket No. 25-1 at 15-16 (Lawrence Dep. at 173-74).

[18]Docket No. 25-1 at 14 (Lawrence Dep. at 169); Docket No. 26 at 2 (Ellingson Decl. at ¶¶ 6-7).

[19]Docket No. 26 at 2 (Ellingson Decl. at ¶ 8).

paying technicians an additional eight hours of wages as bonus pay when they had to stay overnight on Fire Island.[20] Lawrence contends the eight additional hours of pay is insufficient. He filed this FLSA complaint against GE in September 2023, claiming that GE violated the FLSA by failing to pay him for "hours that he worked for [GE] during the overnight shifts he spent on Fire Island."[21] More specifically, he alleges that he spent 1,200 overnight hours on Fire Island between September 21, 2020 and September 20, 2023 for which he was not compensated and that these hours, which were in excess of his regularly scheduled 40-hour work week, constitute overtime hours that must be paid accordingly.[22]

GE now moves for summary judgment. It argues that Lawrence has not shown that he worked enough hours to be entitled to overtime on any specific week and argues that Lawrence's entire post-shift time on the island was non-compensable under the FLSA, its accompanying regulations, and the applicable case law. Lawrence opposes the motion based on a "continuous workday" rule. He argues that all of the time he spent on Fire Island, regardless of how he spent it, was one long work shift that must be compensated accordingly.

---

[20]Docket No. 27 at 2 (Faul Decl. at ¶ 3); Docket No. 32-1 (Ex. A).

[21]Docket No. 1 at ¶ 3.5.

[22]Docket No. 32 at 6; Docket No. 32-1 (Ex. A). Initially, Lawrence alleged he spent over 928 uncompensated hours on Fire Island from September 18, 2020 to September 19, 2023. Docket No. 1 at ¶ 3.7. He now asserts that he spent "1,200 overnight hours between September 21, 2020 and September 20, 2023 on Fire Island" that were not compensated, and he includes a chart listing all the days he slept on the island. Docket No. 32-1 (Ex. A). For those days, based on the chart, he argues that he is entitled to be paid 16 hours of overtime— 3:00 p.m. to 7:00 a.m.—which are the hours between his regularly scheduled shifts.

Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. Id. at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." Arandell Corp. v. Centerpoint Energy Servs., Inc., 900 F.3d 623, 628-29 (9th Cir. 2018) (quoting T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

Discussion

Lawrence brings this lawsuit under the FLSA, asserting that "GE failed to pay [him] for overnight hours that he spent on Fire Island."[23] He argues that all the time he spent on the island, including time spent sleeping, is compensable work. Indeed, it is axiomatic under the FLSA that employees be paid for all hours worked. 29 U.S.C. §§ 206-07. The FLSA requires workers be paid a minimum wage, establishes a standard 40-

---

[23]Docket No. 32 at 6.

hour workweek for qualifying employees, and requires that these employees be paid one and a half times their regular pay rate for time worked beyond 40 hours in a week. Id. The act, however, does not define what constitutes "work" or which hours are included in a workday for purposes of calculating overtime pay, and thus courts have had to develop the parameters of these FLSA provisions. IBP, Inc. v. Alvarez, 546 U.S. 21, 25 (2005). They have defined "work" as activities "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Buero v. Amazon.com Servs., Inc., 61 F.4th 1031, 1036-37 (9th Cir. 2023) (quoting Tenn. Coal, Iron & R.R. Co. v. Muscoda Loc. No. 123, 321 U.S. 590, 598 (1944)). Initially after the passage of the FLSA, courts deemed "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace" to be compensable time which counted toward the 40-hour workweek calculation. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 690-91 (1946). This expansive definition therefore encompassed all preliminary activities needed to get ready for the job's duties, like "walking to work on the employer's premises" and "turning on switches for lights and machinery." Cadena v. Customer Connexx LLC, 51 F.4th 831, 836 (2022) (citing Anderson, 328 U.S. at 691-93).

 Congress disagreed with the courts' broad application of what constitutes compensable work and passed the Portal-to-Portal Act, 29 U.S.C. §§ 251-62, which amended the FLSA to correct this judicial interpretation. The Portal-to-Portal Act amendments exclude some activities from being considered compensable work. In the absence of an agreement, custom, or practice, the act clarifies that the FLSA does not cover (1) walking on the employer's premises to and from the actual place where the employee performs the job's principal activities; and (2) activities that are "preliminary to

or postliminary to" the job's principal activities, meaning those activities that "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). The effect of these amendments made it clear that ordinary commute time to and from the place an employee performs his principal activities is non-compensable under the FLSA. See Imada v. City of Hercules, 138 F.3d 1294, 1296 (9th Cir. 1998); see also Aiken v. City of Memphis, 190 F.3d 753, 758 (6th Cir. 1999).

In light of the Portal-to-Portal Act, the Supreme Court determined that work-related activities performed either before or after an employee's regular work shift are only compensable "if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed." Steiner v. Mitchell, 350 U.S. 247, 256 (1956). "An activity is . . . integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Integrity Staffing Sols., Inc. v. Busk, 574 U.S. 27, 33 (2014). Integral and indispensable tasks are considered part and parcel of a job's principal activities. Cadena, 51 F.4th at 836 (citing IBP, 546 U.S. at 37).

Regulations promulgated after the Portal-to-Portal Act clarified that the act's exclusions do not apply to activities that an employee engages in after he "commences to perform the first principal activity on a particular workday and before he ceases the performance of the last principal activity on [that] particular workday[.]" 29 C.F.R. § 790.6(a). Relatedly, the compensable workday—which is defined as the period between the commencement and completion of an employee's principal activity for the day—is

continuous in that it includes "all time within that period whether or not the employee engages in work throughout all of that period." 29 C.F.R. § 790.6(b).

Lawrence argues that his time on Fire Island is compensable under these basic FLSA principles. Based on the evidence Lawrence included in support of his opposition, he seeks overtime compensation for an extra 16 hours on days he ended up having to stay on the island.[24] The requested 16 hours per day presumably covers Lawrence's post-shift time through the next day's starting time (3:00 p.m. to 7:00 a.m.). Lawrence stayed a total of 85 nights on Fire Island over a span of three years, averaging a little over two nights a month, which he calculates entitles him to recover over $60,000 in unpaid overtime wages after accounting for the bonus pay he received as a concession for having to spend the night.[25]

While Lawrence's work responsibilities precipitated his overnight hours on Fire Island, those hours are, nonetheless, not compensable under the FLSA and accompanying regulations. The mere fact that Lawrence cannot return home after work some days is not in and of itself determinative under the FLSA. Indeed, based on the FLSA regulation addressing work-related travel that keeps an employee away from home—i.e., overnight travel necessitated by work— time spent traveling can be compensable when the travel "cuts across the [employee's] normal workday or the corresponding hours on nonworking days." Imada, 138 F.3d at 1297 (citing 29 C.F.R. § 785.39). There is no mention or suggestion that the time spent sleeping while traveling for work is compensable. In cases applying this rule, it is the travel time itself that is at issue— the fact that the employees

---

[24]Docket No. 32-1.

[25]Docket No. 32-1.

ORDER – Motion for Summary Judgment     - 8 -

must sleep away from home because of work travel is not challenged as uncompensated work. See, e.g., Imada, 138 F.3d at 1297 (holding that the plaintiffs were not entitled to compensation for travel time when the employer sends them to an overnight training in another city because their travel time does not cut across normal workday hours); Walters v. Pro Lab. Grp., LLC, No. 1:21-cv-02831, 2023 WL 6393743 (S.D. Ind. Aug. 25, 2023) (considering whether the plaintiff employee's travel time to and from remote work sites where he stayed for multiple days was compensable and finding that under 29 C.F.R. § 785.39 a "workday" means regular working hours and therefore any travel time between remote work sites and back to home during the plaintiff's regular working hours would be compensable); Mendez v. Radec Corp., 232 F.R.D. 78, 87 (W.D.N.Y 2005) (finding that the employees who traveled to remote work sites for construction projects must be compensated for that travel time and that, although they did not have regularly scheduled work shifts, travel time compensation could be determined based on the typical schedule for any given project). Lawrence does not cite any case where time spent sleeping away from home was deemed compensable because it was necessitated by work.

Whether the time spent overnight is compensable depends instead on what the employee is required to do and does during that time. Lawrence does not argue or cite evidence to show that he spent any time performing his repair or maintenance duties after 3:00 p.m.[26] While there were chats about work between his co-workers, those were not

---

[26] Based on the briefing, Lawrence grounds his FLSA claim only on his inability to leave Fire Island at the end of his regularly scheduled day. He does not contend or provide evidence claiming he performed maintenance or repair work after 3:00 p.m. that went uncompensated. Indeed, any such claim could not survive summary judgment in the absence of facts from which to infer the amount and extent to which he performed his primary duties past 3:00 p.m. See Ader v. SimonMed Imaging Inc., 465 F. Supp. 3d 953, 965 (D. Ariz. 2020) (discussing the plaintiff's burden of proof when asserting a claim for
(continued...)

required debriefings and Lawrence in fact avoided such conversations.[27]

Even if not actively engaged in primary work duties, Lawrence's post-shift time on Fire Island could be compensable if he had been on call during that time. However, even when an employee is on call, not all time spent waiting at the behest of an employer is necessarily compensable working time. Time spent waiting is only working time if it is spent "primarily for the benefit of the employer and his business." Owens v. Loc. No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 350 (9th Cir. 1992) (quoting Armour & Co. v. Wantock, 323 U.S. 126, 132 (1944)). That is, employees who have been engaged by their employer to wait for work are compensated and those who are simply waiting to be engaged are not. Skidmore v. Swift & Co., 323 U.S. 134, 137 (1944); Owens, 971 F.2d at 350. To determine whether the time an employee spends waiting is compensable working time, courts consider two predominant factors: (1) the degree to which the employee is free to engage in personal activities; and (2) whether there is an agreement between the parties. Brigham v. Eugene Water & Elec. Bd., 357 F.3d 931, 936 (9th Cir. 2004).

There is no evidence here to support a finding that Lawrence was on call in a working capacity while remaining overnight on Fire Island. He was not engaged by GE to wait and be ready for work while stuck on the island. He does not cite evidence to show he was ever asked to perform work tasks or stay ready to perform such tasks after his regular shift was done. Indeed, the record shows he was never awakened for work-related

---

[26](...continued)
overtime under the FLSA).

[27]Docket No. 25-1 at 14 (Lawrence Dep. at 169); Docket No. 26 at 2 (Ellingson Decl. at ¶¶ 6-7).

reasons.[28] He engaged in personal activities while on the island, including using the internet, reading, being with his dog, and even having alcoholic drinks.[29] At most, Lawrence simply waited on the island to engage in work the next morning.

Furthermore, there is no evidence of an agreement that would support overtime pay. To the contrary, given the record presented here, the parties seem to have had a constructive agreement that time spent waylaid on Fire Island was not compensable overtime but rather time subjected to bonus pay, which increased substantially in early 2023.[30] See Brigham, 357 F.3d at 938 ("Our caselaw clearly recognizes that an agreement cognizable for purposes of the FLSA [on-call] overtime inquiry may arise by conduct . . . [and] [o]ur sister circuits likewise have recognized the force of constructive agreements in the FLSA overtime compensation context."). Lawrence was aware of GE's compensation policy with regard to overnight stays on Fire Island and continued to work under that policy until September 2023. See Berry v. Cnty. of Sonoma, 30 F.3d 1174, 1180 (9th Cir. 1994) (noting that "[a] constructive agreement may arise if employees have been informed of the overtime compensation policy and continue to work under the disclosed terms of the policy"); Brigham, 357 F.3d at 939 (finding there was an agreement about the employer's on-call compensation policy because the employees accepted shifts with a prior understanding of how they were to be compensated for those shifts and, knowing about the policy, they continued to work). Lawrence emphasizes the rudimentary conditions of the housing and his limited geographical freedom while on the island, but under Ninth Circuit

---

[28] Docket No. 26 at 2 (Ellingson Decl. at ¶ 8).

[29] Docket No. 25-1 at 14-18 (Lawrence Dep. at 169, 172-75, 177, 180, 182).

[30] Docket No. 27 at 2 (Faul Decl. at ¶ 3).

ORDER – Motion for Summary Judgment    - 11 -

law, "an employee need not have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject." Brigham, 357 F.3d at 936 (quoting Owens, 971 F.2d at 350-51) (internal quotation marks omitted).

Lawrence does not actually oppose GE's motion for summary judgment by presenting a factual dispute about his duties and activities while on Fire Island after 3:00 p.m. He admittedly "does not argue that he was doing on-call work for GE when he was on Fire Island, nor does he allege that he was engaged in strenuous activities during the entirety of the time he was on the island."[31] Instead, he basis his opposition to summary judgment on the continuous workday rule.

The continuous workday rule defines the workday as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 C.F.R. § 790.6(b). Lawrence argues that because his principal work activities began at GE's Anchorage office every day, his "workday" included all the hours he was traveling to and remaining at the remote work site and only ended when he was delivered back to the Anchorage office. He contends that only then did his efforts for GE end. In other words, he argues that all his time away from the office was "at the request of his employer" and "primarily for GE's benefit" and therefore was compensable working time.[32]

Lawrence's argument is without merit. Again, that Lawrence finds himself on Fire Island because of his work for GE does not define the parameters of his workday under the

---

[31]Docket No. 32 at 10.

[32]Docket No. 32 at 10.

ORDER – Motion for Summary Judgment        - 12 -

FLSA. Instead, as noted above, a workday is defined by principal activities, including all related integral and indispensable tasks. "The 'integral and indispensable test is tied to the productive work that the employee is *employed to perform*' and does not include all activities an employer requires." Cadena, 51 F.4th at 837 (quoting Integrity Staffing, 574 U.S. at 36). In other words, an activity is not deemed integral and indispensable simply because it is work related or done because of work. An example of an integral and indispensable activities include time spent changing clothes at the beginning of a shift and time spent showering after that shift for workers at a battery plant who are exposed to toxic chemicals as part of their primary activities. See Steiner, 350 U.S. at 256. Other examples include time a butcher at a meatpacking plant spends sharpening knives before a shift, Mitchell v. King Packing Co., 350 U.S. 260, 263 (1956), or time a garment worker spends distributing clothing at the other employees' work benches before the shift starts, 29 C.F.R. § 790.8(b)(2).

There is no factual dispute about Lawrence's primary job activities. As a wind turbine technician, Lawrence's primary duties were "monitoring, repairing, and maintaining wind turbines."[33] Any activity integral to those duties would trigger the start of the workday, such as when he logs into GE's computer systems to monitor the turbines at the beginning of his shift. Therefore, the start of Lawrence's workday is triggered not when he arrives at the Anchorage office per se but when he commences his monitoring-related tasks. The workday ends when those principal duties are complete, including any tasks integral to his repair or maintenance duties, such as descending the wind turbines, managing equipment, or removing necessary protective gear and the like. There is no

---

[33]Docket No. 32 at 4.

ORDER – Motion for Summary Judgment        - 13 -

support for Lawrence's position that staying overnight at a remote location and waiting there to begin the next day's shift is an indispensable and integral part of his principal duties. To find otherwise would be contrary to the law which makes clear that not all activities required or time expended because of work needs to be compensated. Again, it is how that time is used and what activities are done during that time which determines compensation. It is undisputed that Lawrence engaged in personal activities, not activities primarily for the benefit of GE, when stuck overnight on Fire Island.

Indeed, Lawrence's contention that his "workday ended only when he was returned back to the [Anchorage office]" is unsupported in his opposition briefing.[34] He summarily cites to the Portal-to- Portal Act and IBP but neither imposes a location requirement on the concept of a workday. To the contrary, the Portal-to-Portal Act's amendments, which sought to limit compensable activities, focus on defining the job's primary activities. Accordingly, the Court in IBP looked at what constituted the plaintiff employees' principal activities in order to determine the confines of their workday. Specifically, the Court stressed that integral and indispensable tasks leading up to or concluding a job's principal duties are, in and of themselves, principal activities and not preliminary or postliminary activities for purposes of the Portal-to-Portal Act. IBP, 546 U.S. at 29 (citing Steiner, 350 U.S. at 252-53). As such, it found that integral and indispensable tasks trigger the start of the workday and complete the end of the workday. Id. at 33-34. The Court then held that the time the plaintiff employees spent walking to their workstations after donning their indispensable protective gear and the time they spent waiting to remove that gear is compensable under the FLSA. Id. at 33-37, 39-40. However, it held that the time

---

[34]Docket No. 32 at 8-9.

employees spent waiting to put on their necessary protective gear before the start of a work shift is not compensable because the "workday" is not triggered until an employee dons the first piece of gear. Id. at 40-42. These holdings are premised entirely on the basis that a workday is bookended by the commencement and completion of primary activities, not some location requirement as propounded by Lawrence.

Lawrence's reliance on the Court's discussion in IBP of 29 C.F.R. § 790.7(h), a FLSA regulation addressing preliminary and postliminary activities, is misplaced. That regulation simply acknowledges that determining which activities are preliminary and postliminary to a specific job is highly fact dependant: "[A]n activity which is a "preliminary" or "postliminary" activity under one set of circumstances may be a principal activity under other conditions." 29 C.F.R. § 790.7(h). In IBP, the Court rejected the argument that § 790.7(h) requires an employer to pay employees starting at the time they arrive on the premises to get ready for their work shift. 546 U.S. at 41. The Court clarified that § 790.7(h) does not require that all time spent prepping and waiting for work be compensated. Instead the regulation says that in certain circumstances waiting to start work can be compensable, such as when a employee reports for duty as required by the employer but there is no work to perform because supplies or equipment are not ready. Id. That type of situation is not presented here.

Lawrence also cites 29 C.F.R. § 785.38 in support of his argument that his overnight time on Fire Island is compensable. That regulation addresses travel that is "all in the day's work." It provides that travel that is part of the employee's principal activities— "such as travel from job site to job site *during the workday*"—is compensable time. 29 C.F.R. § 785.38 (emphasis added). There is no dispute that Lawrence is entitled to, and was compensated for, the travel to and from Fire Island as part of his day's work.

ORDER – Motion for Summary Judgment         - 15 -

The issue raised by Lawrence is whether his time spent waiting overnight on the island after his regularly scheduled day ended, 3:00 p.m. through 7:00 a.m., is entitled to compensation. That issue is not addressed under § 785.38, and the regulation does not change the Court's determination that such waiting time is not compensable here given the undisputed facts in this case.

## Conclusion

GE's motion for summary judgment[35] is granted. GE is entitled to judgment dismissing Lawrence's complaint.

DATED at Anchorage, Alaska this 29th day of April, 2025.

/s/ H. Russel Holland
United States District Judge

---

[35] Docket No. 23.